LICHTENBERGER v. NEWHOUSE.

HOWSON v. NEWHOUSE.

MATHEZ v. NEWHOUSE.

Nos. 2256-7-8.   Decided April 26, 1912 (123 Pac. 624).

1. TENANCY IN COMMON—CORPORATE STOCK—SALE—OPTIONS—CON-STRUCTION. Defendant on January 7, 1909, secured the sole, exclusive, and prior option to purchase 250,000 shares of the treasury stock of a mining company at twenty-five cents per share. On the 13th following he assigned to three others each an undivided one-fourth interest in such option, and on the 15th they contracted to give defendant the exclusive right or option to purchase 250,000 shares of the treasury stock of the corporation at thirty-five cents per share; twenty-five cents per share to be paid to the mining company and ten cents to the three assignees in equal shares. Defendant purchased 60,000 shares under the contract of January 15th, and on May 12th the assignees executed to defendant another contract which was substantially the same as that of January 15th. On May 18th, the assignees claiming that defendant was indebted to them for stock sold, which he disputed, a further writing was entered into, reciting that it was understood that until defendant made a "deal," and so long as he had to personally pay out cash for the stock, he was only to pay at the rate of twenty-five cents a share for the treasury shares. *Held*, that after the assignment of the interest in the option of January 7th, and the execution of the options of January 15th and May 12th, respectively, defendant could no longer purchase any shares under the option of January 7th alone, but was required as a matter of law to exercise the options of January 15th and May 12th in connection with the original option in the purchase of the stock, and hence for the stock so purchased by him he was bound to account to the assignees for an amount equal to 10 cents per share, but not as to treasury stock taken up by the assignees themselves under a privilege given by defendant on the execution of the January 15th contract to purchase such portion of the treasury stock as they might desire at twenty-five cents a share.   (Page 29.)

2. TENANCY IN COMMON—CONTRACTS INTER SE—SALE OF COMMON PROPERTY. Tenants in common may contract with each other regarding the management or the disposition of the common property, one tenant being authorized to make a valid contract with his cotenants for the exclusive right to sell and dispose thereof.   (Page 31.)

3. TENANCY IN COMMON—SALE OF STOCK—OPTIONS—MODIFICATION—
"MAKE A DEAL." Defendant, having an option to purchase the
treasury stock of a corporation at twenty-five cents a share,
assigned three-fourths thereof to plaintiffs and took from
them an option to purchase the same stock at thirty-five
cents per share, agreeing to pay twenty-five cents to
the corporation and ten cents to the assignees. The origi-
nal option required that at least 20,000 shares be taken and
paid for each month, and, a dispute having arisen, a subsequent
contract was made between plaintiffs and defendant that until
defendant "made a deal," and so long as he personally had to
pay out cash, he was only to pay at the rate of twenty-five cents
a share for the treasury stock. *Held*, that such latter contract
was a modification of the prior assignment contract and re-
lieved defendant from the payment to the assignees of the ten
cents a share on all treasury stock thereafter purchased by
him until he should succeed in making a deal, which was not
shown by proof that he succeeded in inducing S. to take up
one monthly installment under the original option at twenty-
five cents a share. (Page 34.)

APPEAL from District Court, Third District; *Hon. Geo. G. Armstrong*, Judge.

Actions by F. J. Lichtenberger, E. E. Howson and an-
other, and Auguste Mathez against Samuel Newhouse.

Judgment for plaintiff in each case. Defendant appeals.

REVERSED ON CONDITION.

*Parsons & Parsons* for appellant.

*M. E. Wilson, E. A. Walton* and *Booth, Lee, Badger, Rich & Parke* for respondents.

STATEMENT OF FACTS.

On the 7th day of January, 1909, the Commercial Mining Company, an Oregon corporation, entered into a contract in writing with Samuel Newhouse by which it gave Newhouse an option to purchase, or to dispose of to others, 250,000 shares of its capital stock then in the treasury. The purchase

price of the stock was fixed at twenty-five cents per share and was to be purchased or disposed of by Newhouse at the rate of not less than 20,000 shares per month. The first payment under the contract was to be made February 7, 1909, and the succeeding payments every thirty days thereafter. Newhouse, under the contract, was also given an option to purchase the remainder of the capital stock of the company amounting to 750,000 shares at the rate of thirty-six cents per share. The contract further provided "that not less than 250,000 shares of said stock shall be taken and paid for on or before twelve months from the date of these presents, 250,000 shares on or before fifteen months from the date of these presents, and the remaining 250,000 shares on or before eighteen months from the date of these presents; certificates for said stock . . . to be issued" to Newhouse upon the payment of the purchase price thereof. It also provided that "time and exact performance shall be deemed of the essence of this contract," and that in case Newhouse should fail to purchase the treasury stock, or any part thereof, in the manner, at the times, and for the considerations mentioned, or to exercise the option to purchase the 750,000 shares of stock theretofore issued in the manner, at the times, and upon the conditions mentioned, "then and in either of said cases, this contract shall become null and void, and of no further force or effect." On the 13th day of January, 1909, six days after the execution of the contract just mentioned, Newhouse assigned to Henry Catrow, Auguste Mathez, and E. E. Howson each an undivided one-fourth interest in and to the option above mentioned. The assignment recites:

"In consideration of the sum of one dollar ($1.00) and other good and valuable consideration, . . . I do hereby sell, assign, transfer, set, and deliver over unto each of the said Auguste Mathez, Henry Catrow and E. E. Howson . . . one-fourth (¼) of all of my right, title, and interest in and to a certain contract entered into between me and the Commercial Mining Company, a corporation, organized under the laws of the State of Oregon, dated January seventh, 1909." Two days after the execution of the assignment, the

parties thereto entered into an agreement in writing, which, so far as material here, is as follows:

"This agreement made and entered into in quadruplicate this fifteenth day of January, A. D. 1909, by and between Samuel Newhouse, Auguste Mathez, Henry Catrow and E. E. Howson, . . . witnesseth: Whereas, Samuel Newhouse, by a certain agreement in writing bearing date the 7th day of January, 1909, entered into by and with the Commercial Mining Company, a corporation, . . . was granted and given an option to purchase two hundred and fifty thousand (250,000) shares of the capital stock of said Commercial Mining Company, in the treasury thereof; also an option to purchase seven hundred and fifty thousand (750,000) shares of said capital stock theretofore issued, for the price and upon the terms and conditions therein stated; and whereas, Samuel Newhouse by an instrument in writing dated the 13th day of January, 1909, sold and assigned unto each of said Auguste Mathez, Henry Catrow and E. E. Howson, respectively, a one-fourth (1/4) interest in said option contract; and whereas, the parties hereto are the owners of said option contract, each owning a one-fourth interest therein: Now, therefore, to subserve the best interest and advantage of the parties hereto respectively, as the owners of said option, and in consideration of the sum of one dollar by each to the other in hand paid . . . the parties hereto do agree as follows, to wit: First. That said Samuel Newhouse, up to and including the 1st day of August, 1909, shall have the sole, exclusive and prior right or option to purchase and take up the two hundred and fifty thousand (250,000) shares of the capital stock of said Commercial Mining Company denominated treasury stock in said option contract with said Commercial Mining Company, by paying for the same at the rate of thirty-five cents (35c) per share, out of which twenty-five cents (25c) per share shall be paid as provided in said option agreement, and the remaining ten cents (10c) per share shall be paid to the parties hereto in equal proportions. . . . Second. In the event said Samuel Newhouse does not desire or intend to exercise the option herein

granted to him, by making any of the monthly payments re-
quired to be made to said mining company under the terms of
the said option contract, prior to August 1, 1909, to prevent
forfeiture of said option contract he hereby agrees to give
due notice of such intention to the other parties hereto, in
time for them or either of them to make the payments re-
quired to be made to prevent said option contract from for-
feiture, if they or either of them desire so to do."

Four days after the execution of this agreement (January
19, 1909), Henry Catrow and E. E. Howson together sold
and assigned to F. J. Lichtenberger an undivided one-sixth
interest in all of the contract mentioned. Between February
1 and April 23, 1909, 60,000 shares of the treasury stock of
the mining company were purchased under these contracts.
The purchase was made by installments of 20,000 shares each
as provided in the contracts. Certificates of this stock were
issued in the name of Newhouse. On April 23, 1909, New-
house sent a telegram from New York to his associates
Mathez, Howson, Catrow, and Lichtenberger, canceling his
agreement with them bearing date of January 15th herein-
before mentioned. After the contract of January 15th was
thus abrogated, Catrow, on May 7th, purchased for one Bet-
tles the installment of 20,000 shares required to be purchased
in May under the contract with the mining company of Jan-
uary 7, 1909. This block of stock, however, is not involved
in this controversy. On May 12, 1909, Lichtenberger,
Catrow, Mathez, and Howson united in excuting to Newhouse
another contract, which, so far as material here, recites:

"(1) That said party of the second part (Newhouse)
shall have the option to purchase said 127,500 shares of the
treasury stock of said Commercial Mining Company at the
rate of thirty-five cents per share, upon the express condition
that said party of the second part takes and pays for at the
rate aforesaid, not less than 20,000 shares on or before the
first day of each consecutive month, commencing on the 1st
day of June, 1909, and provided further that payment for
said stock is made at the price and time as aforesaid as fol-
lows: Twenty-five cents per share to be paid to said Com-

mercial Mining Company pursuant to said option contract, and the remaining ten cents per share to be paid to the National Bank of the Republic in Salt Lake City, Utah, to the credit of the parties of the first part. (2) The party of the second part is also hereby given the option to purchase . . . 512,500 shares of the issued capital stock of said Commercial Mining Company at the rate of fifty cents per share, upon the following express conditions (specifying the number of shares in each installment and the time of payment) at the rate of fifty cents per share, of which amount thirty-six cents per share shall be paid (to the mining company) under the terms of the original option contract and the remaining sum of fourteen cents per share shall be deposited at the National Bank of the Republic in Salt Lake City, Utah, to the credit of the parties of the first part."

On the 18th day of May, six days after the execution of this contract, the parties thereto met at Newhouse's office, and Mathez there claimed that Newhouse was indebted to him and to each of the other parties who had joined in giving Newhouse the option of January 15, 1909, two and one-half cents for each share of treasury stock theretofore purchased by Newhouse. This claim was disputed by Newhouse, and after some controversy Catrow, Lichtenberger, Mathez, and Howson signed a certain writing prepared by Newhouse and addressed to himself which reads as follows:

"We have entered into an agreement with you dated May 12th, giving you an option on the Commercial Mining Company's shares. It is understood that until you make a deal, and so long as you have to personally pay out the cash, you are only to pay at the rate of twenty-five cents per share for the treasury shares."

It is admitted that Newhouse purchased 20,000 shares in June. On June 3d Howson sold and assigned to one Ziegler an undivided one-twelfth interest in and to all of the contracts mentioned.

It seems that Newhouse was unable to make satisfactory "deal" with other parties to take the stock off his hands as he should obtain it from the mining company, or to sell at a

profit the stock which he had already purchased under the options mentioned, and decided to withdraw from the venture unless the plaintiffs herein joined with him in the purchase of the stock from the company. On June 24, 1909, he wrote Mathez, and, among other things, he said: "I shall not buy any more stock in the property unless those in interest join with me. This is to notify you so that you can act accordingly." Mathez received this letter and replied thereto in part as follows: "I am in receipt of your favor of the 24th of June and will notify Mr. Catrow and Howson of its contents." These parties failed to join with Newhouse in the purchase of stock, and he made no further purchases on his own acocunt. It is admitted, however, that he solicited and induced one Schrimer to purchase 20,000 shares of this stock in July, 1909. Lichtenberger, Mathez, Howson, and Ziegler claimed that Newhouse purchased 60,000 shares of stock under the contract of January 15th and 40,000 shares under the contract of May 12, 1909.

Mathez and Lichtenberger separately, and Howson and Ziegler jointly, commenced actions against Newhouse to recover their *pro rata* share of the ten cents per share alleged to be due them on the stock purchased by him under the contracts last mentioned. In these several actions the same form of complaint was adopted; the only difference being in the amounts claimed. Newhouse answered in each action denying the alleged indebtedness and affirmatively alleging "that said purchase was made for the benefit of the plaintiff Mathez, the said Howson, Catrow, Lichtenberger, and this defendant, and to prevent a forfeiture of said contract as above set forth, and for no other purpose whatever." In the answers it was further alleged:

"On the 18th day of May . . . Mathez, Howson, Catrow and Lichtenberger, in consideration of the defendant's efforts to sell and dispose of all the treasury shares of said mining company then remaining in the treasury of said company, for the joint advantage and profit of Mathez, Howson, Catrow, Lichtenberger and this defendant, and of this defendant's agreement to continue such efforts, by an instru-

ment in writing released this defendant from all obligation to pay for said treasury shares under any of the options granted to this defendant, . . . until this defendant should make a deal with other parties for the sale or disposition of said treasury shares covered by said options of January 7, January 15 and May 12, 1909, at a price which would realize a profit to the plaintiff and said other parties."

The three cases were consolidated for the purposes of the trial only, and were tried to the court without a jury. The court found on the issues in favor of the plaintiffs and in each case rendered judgment against the defendant. The defendant has prosecuted a separate appeal in each case. Each one of the transcripts of the evidence taken and the proceedings had in the lower court is an exact duplicate of the other two; hence but one abstract was filed on appeal, and the three cases were argued together in this court.

McCARTY, J. (after stating the facts as above.)

The contract of January 7, 1909, secured to appellant "the sole, exclusive and prior right or option to purchase and take up two hundred and fifty thousand shares of the treasury stock of the Commercial Mining Company." On January 13, 1909, appellant assigned to Catrow, Mathez, and Howson each an undivided one-fourth interest in the option contract of January 7th. On January 15, 1909, Catrow, Mathez, and Howson entered into a contract in writing with appellant giving him the sole and exclusive right or option to purchase 250,000 shares of the treasury stock at the rate of thirty-five cents per share, out of which twenty-five cents per share was to be paid to the mining company as provided in the contract of January 7th, and the remaining ten cents per share was to be paid to the parties to the contract in equal proportions. That is, Catrow, Mathez, and Howson each was to receive from appellant two and one-half cents for each and every share of stock purchased by him under the contract. The court, in its findings of fact, found that appellant, under the contract of January 15th, purchased 60,000 shares of stock and that Mathez and Lich-

tenberger each, and Howson and Ziegler jointly, were entitled
to recover from appellant a "sum equal to one-sixth of $6000,
to wit, one thousand dollars." The court also found that ap-
pellant, under the contract of May 12th, the provisions of
which are substantially the same as those contained in the
contract of January 15th, purchased during the months of
June and July 40,000 shares, and that he thereby became
indebted to Mathez and Lichtenberger each and to Howson
and Ziegler jointly "in a sum equal to two-ninths of $4000
or, to wit, in the sum of $888.88." Appellant assails these
findings on the ground that they are not supported by evi-
dence. His counsel contends that he, Catrow, Mathez, and
Howson were tenants in common in the contract of January
7th, and that this relation continued to exist after the con-
tracts of January 15th and May 12th, respectively, were exe-
cuted. In their brief they say: "The first and most im-
portant question , . . to determine is, under which
option the shares purchased were purchased by appellant,
that of January 7th alone, or those of January 7th and 15th
and January 7th and May 12th." And by way of argument
they say: "His (appellant's) right to purchase the treasury
shares pursuant to the terms of the option of January 7th
alone was in no way abridged" by the options of January 7th
and May 12th, which, they contend, were merely "offers ob-
tained from his co-owners, offers obtained by contract and
nothing more." And it is further insisted that, as no evi-
dence was introduced tending to show that appellant intended
to or did exercise the option of January 15th, or that of May
12th, respondents have totally failed in their proof on that
issue.

Upon the other hand, counsel for respondents contend that
after the options of January 15th and May 12th, respectively,
were granted to appellant, he could no longer purchase any
shares at all under the option of January 7th alone, but must
of necessity exercise the options of January 15th and May
12th in connection with that of January 7th in the purchase
of shares of stock, and that this result followed as a matter of
law. In other words, they insist that the contractual rights

and obligations of appellant and respondents, respectively, were defined and fixed by the contracts, and the question of whether appellant, when he purchased the shares of stock mentioned, intended to exercise the option contained in the contract of January 7th alone, or intended to exercise that option in connection with the option contained in the contract of January 15th, or that of May 12th, was not a matter of proof.

We are clearly of the opinion that respondents' position regarding this phase of the case is sound.

Counsel for appellant have devoted much space in their printed brief to the discussion of some of the general principles of law concerning the rights and reciprocal obligations of tenants in common in the management or disposition of the common property. As we view the case, much that is said by counsel for appellant in this regard has but little, if any, bearing upon the questions presented on this appeal. The rule is elementary that tenants in common may contract with each other regarding the management or the disposition that shall be made of the common property. One tenant may make a valid contract with his cotenants for the exclusive right to sell and dispose of the common property. (12 A. & E. Ency. L. [2d Ed.] 672.) The general rule in this regard is tersely illustrated in 38 Cyc. 72, in the following language:

"Tenants in common may contract with each other concerning the use of the common property, and agreements between them, their heirs, personal representatives, and assigns, are as binding as if between strangers, if they do not otherwise conflict with the relationship of tenancy in common, and the rights of the respective parties are held to be enforceable either at law or in equity, for purposes of offense or defense."

In the case at bar, appellant, by virtue of the contract of January 15th, acquired from Catrow, Howson, and Mathez "the sole, exclusive, and prior right or option to purchase and take up the two hundred and fifty thousand shares of the capital stock of said Commercial Mining Company, denominated treasury stock in said option contract with the Com-

mercial Mining Company." This was a completed contract, and was not a mere "offer and nothing more," as counsel seem to contend, and so long as it continued in force neither Catrow, Howson, nor Mathez could, as against appellant, legally purchase any of the shares of stock covered by the contract of January 7th. After the contract of January 15th was executed, the relationship of the parties was changed from what it was under the former contract, and appellant alone had the right to purchase the stock mentioned in blocks of 20,000 shares per month by paying, in the language of the contract, "thirty-five cents (35c) per share out of which twenty-five cents (25c) per share should be paid to the mining company as provided in the option agreement (contract of January 7th) and ten cents (10c) per share should be paid to the parties hereto in equal proportions." In other words, appellant was to pay twenty-five cents per share to the mining company and two and one-half cents per share to each of the other three parties and retain two and one-half cents per share for himself. Suppose, for the purpose of illustration, that this business venture had been a success and the hopes and anticipations of all concerned had been fully realized, and that appellant had continued after the contract of May 12th to purchase the stock in blocks of 20,000 shares per month until the entire capital stock of the mining company had been taken up as provided in the contract of January 7th, and had been disposed of by appellant on the market for one dollar or more per share, would it be seriously contended that appellant would have been under any legal obligation to account to respondents for more than ten cents per share on the treasury stock and fourteen cents per share on the issued capital stock of the mining company? We think not, because, under the plain provisions of the contracts mentioned, all that appellant was required to pay for the stock was thirty-five cents per share for the treasury stock and fifty cents per share for the issued stock, and all that each of the respondents could legally demand was that appellant account to him for his *pro rata* share of ten cents per share on the treasury stock and his proportion of fourteen cents per

share on the issued stock. And that, too, regardless of the amount for which appellant might have sold the stock on the open market, or that he might have realized for it in any "deal" that he might otherwise have made.

Furthermore, we think that appellant's conduct—what he did in the premises—clearly shows that he intended to and did purchase 45,000 shares of the stock under the contract of January 15th for himself only, and, as stated by counsel for respondent in their brief, "he dealt with and exercised dominion over it the same as any other person would deal with and control his own property." On April 23, 1909, appellant, who was in New York, sent a telegram to respondent Mathez which was in part as follows: "I hereby release and cancel C. M. Co. option." And on June 24, 1909, he wrote Mathez a letter in which he said: "I shall not buy any more stock in the property unless those in interest join with me. This is to notify you so that you can act accordingly." Moreover, appellant, in November, 1909, sold 1050 shares of the stock and retained all of the proceeds. In his testimony he said: "I sold 1050 shares. They attempted to make a market in New York, and I jumped in and sold. I think I got thirty-nine cents, and then I could not sell any more." He further testified that he never reported this sale to any of the respondents. But, independent of appellant's intention and his conduct as shown by the record, the contracts of January 15th and May 12th were binding and enforceable, and the record shows that all the stock purchased by appellant was purchased during the life of one or the other of these contracts, and he cannot escape their legal effect by claiming that he intended to and did exercise the option of January 7th alone in making the purchases of stock hereinbefore mentioned. He could not purchase stock under that agreement alone so long as the contract of January 15th or that of May 12th remained in force.

It is further contended on behalf of appellant that the execution of a certain writing by Lichtenberger, Catrow, Mathez, and Howson, which was in the form of a communication from them to appellant, released appellant from the

obligations, if any, he was under to account to these parties in a sum equal to ten cents per share of stock purchased by him. The document, so far as material here, is as follows:

"We have entered into an agreement with you dated May 12th giving you an option on the Commercial Mining Company's shares. It is understood that until you make a deal, and so long as you have to personally pay out the cash, you are only to pay at the rate of twenty-five cents per share for the treasury shares."

It will be noticed that this document refers to the contract of May 12th only. It is a modification of the terms of that contract and relieved appellant from the payment to respondents of ten cents a share on all treasury stock thereafter purchased by him until he should succeed in "making a deal," and so long as he had "to personally pay out the cash" for the stock purchased. The legal effect of the document upon appellant's liability to account to each of the respondents for any part of the purchase price of the stock as fixed by the May 12th contract will be referred to later.

We are of the opinion, however that the court erred in holding that respondents were entitled to recover from appellant on the entire 60,000 shares of stock comprising the installments of 20,000 shares each that were purchased and taken up during the months of February, March, and April, 1909. The evidence, without conflict, shows that appellant, at the time of the making of the January 15th contract, gave Catrow, Howson, and Mathez the privilege of buying a portion of the treasury stock at twenty-five cents per share, and that the offer was not withdrawn during the life of that contract, nor during the time the May 12th contract was in force. Catrow was called as a witness by respondents, and testified on this point as follows:

"Of the capital stock of the Commercial Mining Company purchased for the month of February, 1909, under the contract with that company, Mr. J. B. Risk received 5000 shares, Mr. Newhouse 5000 and I 10,000. . . . At the time the option of January 15th was given, Mr. Mathez said he had

promised to sell Mr. Risk 5000 shares of the stock and Mr. Newhouse said that would be all right."

Later on in the trial Catrow was called as a witness by appellant and testified:

"On almost every occasion, whenever there was any question raised about what was to be done, Mr. Newhouse did offer us—permitted us—he said he would like to have us come in and take our share of the stock. There is no doubt about that. . . . Mr. Newhouse would say something like this: 'Now, I will be very glad to have any of you gentlemen that care to come in and take your stock at twenty-five cents.' . . . He said they (respondents) might take their stock any time they wanted it."

Taking advantage of appellant's offer to all parties interested to take a portion of the stock on which he held an option, respondent Mathez took 5000 shares at twenty-five cents per share. This stock Mathez sold to one Risk, and realized a profit of $500 from the sale. Catrow took 10,000 shares of the stock at twenty-five cents per share. That is, Mathez and Catrow purchased 15,000 and appellant 45,000 of the 60,000 shares of stock received from the mining company during the three months of February, March, and April, 1909. Respondent Howson also availed himself of this opportunity to speculate on the stock covered by the option and entered into negotiations with parties in Portland, Ore., for the sale of the stock represented by his interests in the contracts mentioned. Upon this point appellant testified in part as follows:

"He (Howson) asked me would there be any objection if he could make a deal with people in Portland for the whole amount. . . . The amount of shares on which he had an option, which, of course, we named. I said . . . he had the privilege of doing it; he had the right to do it and make a profit on it just the same as Mr. Mathez had. . . . That was mentioned, I believe, before the April payment was made. . . . The people in Portland evidently didn't buy, because he never came back to me."

Howson was called as a witness by respondents and testified in part as follows:

"I remember a certain occasion on which I spoke to Mr. Newhouse about the possibility of selling some of the stock he had, and it was virtually as Mr. Newhouse mentioned. . . . He told me I could do it if I didn't peddle it. . . . Mr. Newhouse knows nothing about the price I offered it at. I offered it at the price of fifty cents."

It thus appears that while appellant had acquired from these parties "the sole, exclusive and prior right or option to purchase and take up" the stock at a certain price per share, he gave them and each of them the privilege of purchasing, during the life of the option, the amount of stock, or any part thereof, represented by their respective interests in the contracts mentioned, at the same price per share for which he (appellant) obtained it from the mining company. And it further appears that at least two of the parties availed themselves of the privilege accorded them by appellant. While respondent Howson did not purchase any stock, he nevertheless accepted appellant's offer permitting him to do so, and, as herinbefore stated, he entered into negotiations with other parties for the sale of the portion of the stock represented by his interest in the contracts. And his failure to dispose of the stock was not due to any act or omission of appellant.

Under these circumstances, we are unable to understand upon what theory of the law or principle of justice it can be successfully claimed that appellant should be compelled to account to respondents for any part of the contract price of the stock purchased by either Mathez or Catrow. We are clearly of the opinion, however, that appellant should be compelled to account to respondents for their proportion of ten cents a share for each and every share of the 45,000 shares purchased by appellant under the contract of January 15th. We think that the court erred in holding that appellant must account to respondents for any portion of the purchase price (as fixed by the contract of May 12th) of the 40,000 shares of stock received from the mining company during the

months of June and July. Soon after the making of the contract of May 12th, a controversy arose between appellant and respondent Mathez regarding the stock purchased by appellant during the months of February, March, and April. Mathez claimed appellant was indebted to each of the respondents for his proportion of the ten cents per share which the contract of January 15th provided should be paid to the parties thereto in equal proportions. Appellant denied that he was indebted to respondents or any of them in any sum, and announced that if he were compelled to pay more than twenty-five cents per share for the stock before he could make a "deal" with other parties or satisfactorily dispose of the stock, he would withdraw from the enterprise and would have nothing more to do with it. And it was for the purpose of inducing appellant to continue with them in the enterprise or business venture that respondents executed the instrument of May 18th hereinbefore set out, modifying the contract of May 12th. We do not agree with counsel for respondents in their contention that there was no consideration for the document of May 18th. It was provided in the contract of May 12th that the failure of appellant to make the payments therein provided would terminate the contract "without notice." In other words, it was optional with appellant as to whether or not he would continue the contract in force by making the payments as therein provided. On the occasion last referred to, appellant announced that he intended to and would withdraw from the enterprise unless he was relieved from paying respondents the ten cents per share provided for in the contract, and, as a consideration for the modification, he continued his efforts to make a deal with other parties for the sale or disposition of the stock. Now the contract, as modified, provided that appellant would not be required to pay more than twenty-five cents per share for the treasury stock until he made a "deal," or so long as he had "to personally pay out the cash." This was something more than "an extension of time" when he should pay or account to respondents for the ten cents provided in the contract, as contended for by counsel for respondents. When

this modification was made, appellant's liability to pay respondents any money depended upon a contingency. If appellant succeeded in making a deal, he would be liable; if he failed, he would not be. The evidence, however, shows that he made no deal, and that at the time of the trial he was still holding the stock. True, he induced Schrimer to purchase and take up the July installment at twenty-five cents per share; but we think that the record shows he did this to keep alive the contract with the mining company dated January 7th, and that the transaction was in no sense a "deal" as contemplated by the May 12th contract as modified.

As the record now stands, respondent Lichtenberger and respondent Mathez each, and the respondents Howson and Ziegler jointly, are entitled to recover from appellant their *pro rata* of ten cents a share for each and every share of stock purchased by appellant under the contract of January 15th, with interest thereon at the rate of eight per cent per annum from June 24, 1909, the date on which appellant announced his intention of withdrawing from the enterprise. That is, Lichtenberger and Mathez each, and Howson and Ziegler jointly, are entitled to recover one-sixth of $4500, to wit, $750, and interest.

The three causes of action are remanded to the lower court, and the plaintiff, or plaintiffs, as the case may be, are given twenty days from the date of the filing of the remittitur in that court in which to elect in writing whether the judgment shall be modified in accordance with the views herein expressed or a new trial granted. Should the plaintiff in any one or more of the cases fail to elect within the time allowed, the court, in such case, is directed to set aside the findings of fact and vacate the judgment therein made and entered and to make findings and render judgment thereon in accordance with the views herein expressed. Should the plaintiff in one or more of the cases, within the time allowed to make an election as aforesaid, remit of the judgment all in excess of $750 and interest, the court may file and enter of record the writing containing such remission as a modification of the judgment. In the cases, if any, in which the judgments are

modified, each party will be required to pay his own costs; and in the cases, if any, in which new trials are granted, appellant shall be entitled to costs.

FRICK, C. J., and STRAUP, J., concur.